# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
February 10, 2005 Session

## CAROL ANN PELLETT SMITH v. WILLIAM ASHBY SMITH, JR

**Appeal from the Circuit Court for Williamson County**
**No. II-98078    Donald P. Harris, Judge**

---

**No. M2003-02033-COA-R3-CV - Filed June 10, 2005**

---

In this post-divorce proceeding, Wife sought an increase in child support based upon Husband's substantial inheritance from his mother. She also sought relief for Husband's alleged breach of the Marital Dissolution Agreement relative to the disposition of property. She further sought child support based upon imputed income of Husband because of voluntary underemployment. Husband appealed the judgment of the trial court. Wife assigned error as to certain findings by the trial court. We affirm as modified herein the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed as Modified and Remanded**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL and FRANK G. CLEMENT, JR., JJ., joined.

William Ashby Smith, Jr., Nashville, Tennessee, pro se.

James Weatherly, Nashville, Tennessee, for the appellee, Carol Ann Pellett Smith.

## OPINION

Carol Ann Pellett Smith ("Wife") and William Ashby Smith, Jr. ("Husband") had previously been married and divorced without children prior to their second marriage to each other in March of 1995. The Parties' only child, Patrick Smith, was born February 21, 1996. These parties were divorced for the second time in December of 1998. Husband is an attorney having graduated from law school in 1979, and, at the time of the parties' second marriage, was employed by the State of Tennessee as an assistant state attorney general. His income during this employment was $45,000 per year.

At the time of this second marriage of the parties, the mother and father of Husband lived in Shelby County, Tennessee, and were persons of considerable financial means. The father of Husband died on December 2, 1996. Shortly before that date, Husband and Wife determined to

purchase real estate in the Greenbrier community of Williamson County along with a home in the city of Franklin. Husband had planned to open and operate a law practice from his home near the Franklin Courthouse. Before these plans could attain fruition, however, other factors intervened which are best described in the testimony of Husband:

> Q.     So you left the attorney general's office before you were divorced?

> A.     Oh, yes.

> Q.     And why did you leave?

> A.     My father had died in December of '96. Despite the fact that my father and mother were divorced, they were still very good friends. My mother was the parent that actually was the one whose health concerned me.

> My father, while he had had quadruple bypass and was a diabetic and everything, had actually, you know, in the last, you know, couple of years seemed like he had recovered and, you know, was pretty hale and hearty and he would, you know, help her, take here to her doctors' appointments and things of that sort.

> It was, you know, common knowledge everybody in the family knew my mother was terminally ill. So that plus the fact that my father owned a small business in Memphis, Casey's Cars, a used car dealer.

> And there was, you know, the property on Monroe Road that by virtue of how it is, it's the kind of place that you really can't leave unattended very long. It requires a lot of maintenance. It's basically in a clearing of an oak tree forest. About an acre and a half that's cleared and another 16 acres or so surround that.

> I mean, the driveway gets washed out, big limbs fall down – – it's a beautiful place, but it's a lot of work. And my dad, you know, did a real good job despite his ailments. And I think it was a labor of love, him doing that. And so – – but all those reasons.

> And, you know, I was at the point in time doing stuff like going home on the weekend and I had back problems anyway. And when I say going home, I meant home to Memphis to check on mom and things of that sort. That had started really with my dad's death in December, early December of '96.

And I was doing stuff like getting up Monday morning at four a.m. to drive into, you know, the attorney general's office in downtown Nashville and then sometimes have to do things like drive from there to Smithville, Tennessee to take deposition. And, quite frankly, with my, you know, back problems, I just wasn't holding up to it. And it seemed to me that the greater duty laid with, you know, winding up my father's affairs and attending to my dying mother.

Q. And so then you moved to Shelby County, right? That's where the Lakeland property is?

A. Well, I don't know what to say. That it was, you know, at that point in time in February of '97. I don't think that it was an intended, you know, separation per se between Carol Ann and I and certainly wasn't, you know, discussed that way.

Carol Ann and I did discuss this for sometime, some weeks. And during January – – but even before I had actually resigned – – she assisted me in getting a Yellow Page ad in Summerville, Tennessee where I used to do a lot of my business. I worked a lot from Bartlett, Tennessee, which was actually on the east part of Shelby County and convenient to Summerville and some of the outlying areas.

And so we started running a Yellow Page ad or at least contracted to do that in, – – I'm not real sure exactly when it was going to start coming out. But we contracted it in January and I guess maybe it was going to come out, you know, like in April of '97. So it was, you know, contemplated that I was going to practice law there at least, you know, while I was tending to my mother and some other things and deciding what to do with the Monroe Road property.

Q. So when you left the AG's office and moved to Shelby County it was your intent to start a private law practice in Shelby County?

A. I guess the best way to put it is it would be to revive a private law practice. I had done that before there, and, you know, that was the, you know, the thing it seemed like for me to do.

So it is that from February 1997, when he left the state attorney general's office for the stated purpose of starting a private law practice out of the parties' home in Franklin, until September of 1997 when Husband announced that he was moving to Memphis, he spent little time developing a Franklin law practice and most of his time in Memphis attending to his father's estate and to his terminally ill mother.

From February 1997 to the date of divorce in December 1998, Patrick resided with Wife in Franklin with Husband paying nothing for support of the child or to maintain the Greenbrier

property. The parties' leased the Greenbrier property, but the rent per month for the property was $450-$475 per month less than the payment on the mortgage. More problems ensued from the fact that Wife had paid the down payment for the Greenbrier property in the amount of $45,000 from her own funds.

Husband suffered physical problems resulting from an automobile accident in 1994 as well as neck and lower back problems and impaired vision. The degree to which his medical problems were disabling is hotly contested.

The parties negotiated an extensive Marital Dissolution Agreement which was approved by the trial court in a Final Decree of Divorce entered December 8, 1998. This Agreement provided in pertinent part:

> 4. CHILD SUPPORT. Husband shall pay directly to Wife until the child reaches the age of 18 or his class graduates from high school, whichever event occurs later. The Parties also recognize that Husband has recently had surgery, is recovering therefrom, and, since January 1, 1998, has been attempting to re-establish a private law practice which has been and is his sole source of earnings and principal source of income. Under all of the attending circumstances, the Parties agree that the present level of support should be $200.00 per month, payable on the first day of each month, and is based upon Husband having income of approximately $12,000 per annum and complies with applicable child support guidelines. Payment by wage assignment through the Court Clerk is unnecessary, would be costly and is not in the best interest of the Child. No action by the Parties will be effective to reduce support after the due date of each payment and the Parties understand that court approval must be obtained before support can be reduced unless such payments are automatically reduced or terminated in accordance with the terms of this Agreement. Husband's current address is 10725 Monroe Road, Lakeland, Tennessee 38002 and Wife's present address is 414 Bridge Street, Franklin, Tennessee 37064.

> 5. MEDICAL INSURANCE. Wife shall maintain health insurance for the child until the child attains the age of eighteen years or his class has graduated from high school, whichever event occurs later. The Parties shall each pay one half of all medical, prescription, dental and eye care expense incurred by the Child which are not covered by medical insurance. Within 30 days after the entry of a Final Decree in this cause, Husband shall apply for COBRA health insurance coverage for himself and shall be entitled to enjoy such rights thereunder to which he may be entitled. Wife shall fully cooperate in permitting Husband to apply for COBRA coverage.

> . . . .

11. <u>REAL PROPERTY</u>. The Parties own as tenants by the entireties a certain residence located at 414 Bridge Street, Franklin, Tennessee. Wife has or shall place this property upon the market and shall sell it. Wife shall be entitled to retain all profits of such sale after payment of mortgage debt and transaction costs. Husband shall join in the conveyance and shall execute documents reasonably required to effect the transfer of this residence to the new owner.

The Parties also own a parcel of real estate of approximately 65 acres more or less with an existing dwelling house located at 5957 Greenbrier Road, Franklin, Tennessee (hereinafter "Greenbrier Road Real Estate"). Insofar as it is the Parties' belief it will benefit their minor child in having a close and nurturing relationship with the child's father, both Parties are interested in accommodating Husband's moving his residence to this Greenbrier Road Real Estate after the sale of certain other real estate located at 10725 Monroe Road, in Lakeland, Shelby County, Tennessee (hereinafter "Lakeland Real Estate") which is Husband's sole and separate property. Until such time as Husband is able to complete the sale of the Lakeland Real Estate and move his residence to the Greenbrier Road Real Estate, Wife shall pay the mortgage, taxes, and ordinary maintenance expenses thereof and shall be solely responsible for selecting renters and shall be entitled to collect and retain as her separate property all rent, income and other payments attributable to such Greenbrier Road Real Estate and shall be entitled to any income tax deductions arising from same until such time as Wife quit claims her interest in such real estate to Husband, as hereinafter described. Husband shall, as soon as practicable, place the Lakeland Real Estate on the market for sale. Upon the sale of such Lakeland Real Estate, after the payment of mortgage debt and the costs of sale, Husband shall pay Wife the sum of $45,000 in exchange for all of Wife's right, title and interest in and to the Greenbrier Road Real Estate, and Wife shall concurrently execute a quit claim deed conveying her interest to Husband. After the execution of such quit claim deed, Husband shall hold Wife harmless from all mortgage debt, costs and expenses in connection with the Greenbrier Road Real Estate, and he shall be entitled to receive all rent, income, and other payments, and income tax deductions attributable to such real estate. Husband shall, insofar as financially practicable, take steps to secure Wife's release from the mortgage debt on such Greenbrier Road Real Estate; however, the Parties agree and understand that this may not be financially practicable.

In the event Husband is unable to secure Wife's release from all debt obligations secured by the Greenbrier Road Real Estate, Husband shall execute a deed of trust in favor of Wife concurrently with Wife's execution of a deed quit claiming her interest in the Greenbrier Road Real Estate to Husband. The Deed of Trust shall be in a form acceptable to counsel for Wife and shall secure all of Husband's obligations and the performance of all of Husband's duties under the existing Deed of Trust granted by the Parties to secure payment of the mortgage

obligation currently in existence on the Greenbrier Road Real Estate. The Parties shall direct that a copy of any default notices or other communications regarding the first mortgage be mailed to Wife at an address designated by her. Further, notwithstanding the foregoing, if Husband has not secured Wife's release from all debt obligations secured by the Greenbrier Road Real Estate within five (5) years of the entry of a Final Decree of Divorce in this cause, the Greenbrier Road Real Estate shall immediately be placed upon the market and sold. After payment of all remaining debt and the cost of sale, Husband shall be entitled to retain the proceeds as his sole and separate property, free and clear of any claim by Wife.

12. RESOURCE PACKAGING GROUP, LLC. Wife owns an interest in Resource Packaging Group, LLC. Wife shall retain all of her interest therein as her sole and separate property free and clear of any claims by Husband. Wife shall hold Husband harmless from any debts, liabilities or obligations of any nature whatsoever in connection with Resource Packaging Group, LLC.

13. CASEY'S CARS, LLC. Husband is the owner of an interest in Casey's Cars, LLC. Husband shall retain all of his interest therein as his sole and separate property, free and clear of any claims by Wife. Husband shall hold Wife harmless from any debts, liabilities, or obligations of any nature whatsoever in connection with Casey's Cars, LLC.

14. RETIREMENT ACCOUNTS. Husband is the owner of an IRA account in the approximate amount of Thirty Thousand ($30,000.00) Dollars. He is also the owner of a 401(k) account and has vested pension rights in the Tennessee Consolidated Retirement System. Husband shall retain these retirement accounts as his sole and separate property, free and clear of any claims by Wife. Wife is the owner of an IRA account at Jaffre-Auberche, Inc. in the approximate amount of One Hundred Thousand ($100,000.00) Dollars. Wife shall retain this retirement account as her sole and separate property, free and clear of any claims by Husband.

. . . .

18. FULL SETTLEMENT. This Agreement is intended to be a final settlement of all property rights and support rights and obligations of the respective Parties hereto and shall constitute a discharge from all claims of any nature arising out of their marital relationship except as provided herein. Each Party hereby waives and relinquishes to the other all rights or claims which each may have or hereafter acquire under the law of any jurisdiction with respect to the other's property, including without limitation, dower, courtesy, statutory allowance, homestead rights, right to take against the will of the other, inheritance, descent, or distribution, or right to act as administrator or executor of the other's estate except as provided by the terms of this Agreement. This Agreement contains the entire understanding of the

-6-

Parties. There are no representations, warranties or promises other than those expressly set forth herein.

. . . .

21. <u>INDEMNIFICATION</u>. Should any term of this Agreement be violated and one Party be required to pay, or reasonably pay in compromise of any claim, a debt of obligation which is the responsibility of the other Party, the Party who makes such payment shall be entitled to indemnity from the other Party for all sums paid, including the principal amount, interest actually paid and reasonable attorney's fees and court costs. In the event it becomes reasonably necessary for either Party to institute or defend legal proceedings regarding the enforcement of any provision of this Agreement, the prevailing Party shall be entitled to a judgment for reasonable expenses, including reasonable attorney's fees, incurred in prosecuting or defending the action.

Husband's mother died in March of 1999, and Husband received a substantial inheritance from her estate. The record shows:

Q. I understand that. Let me just, if I can, try to short-circuit this and move through it. If you look at page two of the estate tax return, that page suggests that you received as an inheritance $1,470,753, correct?

A. Okay. Well, let's turn there. I'll get there. I may not be as quick as you, but I'll get there. Let me suggest – – and I don't accept your characterization – – is that on the date of this return, okay, and date of this return is June 26, 2000, that based upon what the accountants estimate my portion is worth, $1.470 million. That doesn't mean I received $1.70 (sic) million. What that means on June 26th – – excuse me, on what?

Q. September 25, which is the date of the valuation.

A. Yes, okay. You're talking about the valuation date. On valuation date, that's right. Did I actually receive that, no, I didn't.

Q. I understand that. That's why I'm trying to refer you back to the deposition because that's the point I was trying to get to. The return suggests that your share of the estate after taxes was $1,470,753?

A. Well, again, that's what your characterization suggests. I think if you really know what you're talking about when you look at this thing is as of the date of the valuation, which was September of '99, I didn't receive a lot of this

stuff until October of 2001. And it was [sic] wasn't worth near – – the securities particularly. No, the Oriental rugs didn't change much and the cash was the cash.

Q. I understand what you're saying, but here's the point I'm trying to get to with my questions. In the deposition when I'm asking you questions, what is it that actually got? You said $1,362,275.

A. I'm not disputing that in the deposition that's what I said. I'm not disputing that.

On January 21, 2000, counsel for Wife wrote to Husband asserting that his inheritance provided a significant variance between the $200 per month child support under the December 8, 1998, decree and the amount of child support which would be required under the child support guidelines. This letter likewise complained of Husband's failure to dispose of the Lakeland property in Shelby County and failure to pay the $45,000 due to Wife for the down payment on the Greenbrier Road property pursuant to the terms of the Marital Dissolution Agreement.

On July 3, 2000, Wife filed her "Petition for Increase in Child Support and Petition to Enforce Final Decree." Aside from asserting a significant variance resulting from Husband's inheritance, Wife asserted, ". . . the Respondent has been capable of earning significantly more income than that earned in the past two years. Petitioner submits that Respondent has been 'under employed' and has neglected full-time employment as a result of his inheritance." The Petition quoted the provisions of the Marital Dissolution Agreement relative to the Greenbrier Road property and asserted:

4. The Petitioner would show the Court that the Respondent has breached the contractual obligation assumed by him in paragraph eleven (11) of the Final Decree of Divorce. Respondent failed to place his Lakeland property for sale within a reasonable or practicable time and as of the date of the filing of this Petition, the property remains unsold. Additionally, as the result of his financial windfall from the inheritance referred to above, the Respondent has been able to relocate to the Greenbrier property without the necessity of having first sold his Lakeland property as anticipated by the parties in the Final Decree of Divorce. The Petitioner submits that the failure of the Respondent to place the Lakeland property for sale within either a practicable or reasonable time constitutes a breach of the promises contained within the Marital Dissolution Agreement. Additionally, the Petitioner submits that the relocation of the Respondent to the Greenbrier property without having first sold the Lakeland property and satisfying his financial obligation to the Petitioner as contained within the Marital Dissolution Agreement constitutes a further breach of the promises contained therein.

**WHEREFORE**, the Petitioner prays:

1. That the Respondent be served with this Petition and be required to file his answer in the time provided by law.

2. That upon the hearing of this Petition, this Court find that a significant variance has occurred in the income of the Respondent from the date of the entry of the Final Decree until the present date or alternatively, that the Respondent has been voluntarily under employed, and increase the child support obligation in an amount consistent with the child support guidelines.

3. That the Court find the Respondent to have breached the promises contained within the Marital Dissolution Agreement and grant to the Petitioner a judgment in the amount of $45,000.00.

4. That the Petitioner be awarded her reasonable attorney's fees and the cost of this action.

Husband responded with general denials and with a counter petition for change of custody. After much discovery and legal maneuvering, an order was entered on April 15, 2003, severing the Petition of Wife from the counter petition of Husband and setting Wife's Petition for hearing on June 9, 2003.

The issues under Wife's Petition were tried before Judge Don Harris without the intervention of a jury on June 9 and June 27, 2003. The two primary witnesses were Husband and Wife, and their divergent testimony made their credibility a predominant issue before the trial judge.

On July 15, 2003, the trial court entered its final judgment holding:

1. **Child Support.** During the time that the Defendant has been under a child support Order, he has received by inheritance real property, personal property, cash, stocks and bonds. The Plaintiff has requested that the Court Order an increase in the child support based on the Defendant's inheritance. The Plaintiff has further sought an increase in the child support based on her assertion that the Defendant has been voluntarily unemployed or underemployed. The Court finds that the Mother's request is well taken with regard to cash assets received by the Father in his inheritance and otherwise obtained as the result of his Mother's death. Since the time of this divorce and his inheritance, the Father has failed to sell real property, the sale of which was in the contemplation of the parties at the time of the divorce, and has further used the liquid assets of the inheritance to pay mortgage indebtedness and purchase other assets. The Court finds that the Father's expenditure of the liquid assets of the inheritance for the purpose of eliminating his debt, thereby increasing the net value of his real estate holdings, and his acts of purchasing other assets does not remove those cash assets from being subject to the child support order.

The Court finds that the retained inheritance has a present value of $764,322 and that prudently investing those funds should earn interest of at least five per cent (5%) per annum. The Court finds that these funds so invested would produce income to the Father in the amount of $38,200 per year or $3,182 per month. The Court

finds that income of this amount should be imputed to the Father for purposes of computing his child support obligation.

While the Court finds that the evidence has not been sufficient to prove that the Father has been voluntarily unemployed or underemployed, the Court finds from the evidence submitted that the Father is capable at the present time of earning income of $45,000 per year as a practicing attorney. The Court therefore determines that the Father's child support obligation should be based on a gross income of $83,200 per year or $6,933.33 per month. Applying the Child Support Guidelines to this gross income, the Father's child support obligation is increased from $200 per month to $1,032 per month effective July 1, 2003.

2. **Private School Tuition.** Based on consideration of the assets/liability and income/expense statements presented by the parties, the Court finds that the parties shall be equally liable for the costs of the child's private school tuition. The Court further finds that the Father's liability for one-half of these costs is retroactive to the child's enrollment in Westminster School/Currey Ingram Acadamy. The total tuition expense through the date of this Order is $36,302. The Mother has paid tuition expenses to the school totaling $31,612 and the Father has paid expenses totaling $4,690. The Mother is awarded a judgment against the Father in the amount of $13,461 for tuition expenses paid by her through the date of this Order. All future tuition expenses shall be paid equally by the parties.

3. **Greenbrier Property.** The Court finds that the Defendant has breached his duty of good faith in the marketing of the Lakeland property referenced in the Final Decree of Divorce. The Court awards the Plaintiff a judgment against the Defendant in the amount of $54,000 representing the Defendant's obligation to repay the Plaintiff $45,000 upon the sale of the Lakeland property as set forth in the Final Decree and six per cent (6%) interest per annum from March 1, 2000 through June 30, 2003.

4. **Lien**. The Court awards the Plaintiff a lien interest against the Greenbrier property to secure all amounts owed by Defendant to Plaintiff in this Order including the future child support obligation. The lien shall remain in effect until such time as all obligations under this Order are paid by Defendant or until the child support obligation ends by Order of this Court whichever occurs last. A copy of the legal description of the Greenbrier property is attached to this Order as an exhibit and is incorporated by reference.

5. **Attorney's Fees and Costs.** The Court awards the Plaintiff $30,115.00 as her reasonable attorney's fees and costs incurred in the prosecution of this action. This award is premised on the reasonable charge for such services not exceeding $150.00 per hour. The Plaintiff is therefore awarded a judgment against the

Defendant in the amount of $30,115.00. The Defendant's request for attorney's fees and costs is denied. The Clerk's fees are taxed to the Defendant for which execution may issue.

The Tennessee Rule of Civil Procedure 59 motion filed by Husband was overruled by the trial court, and Husband perfected a timely appeal.

Two considerations are controlling of appellate review in a case tried without the intervention of a jury, and in which questions involving the credibility of witnesses are decisive: the presumption of factual correctness and the appellate disinclination to second-guess credibility determinations. The factual findings of the trial court are presumed to be correct unless the evidence preponderates against them. Tenn.R.Civ.P. 13(d). *See Perry v. Perry*, 114 S.W.3d 465, 467 (Tenn.2003).

> One of the most time-honored principles of appellate review is that trial courts are best situated to determine the credibility of the witnesses and to resolve factual disputes hinging on credibility determinations. *See State v. Pruett*, 788 S.W.2d 559, 561 (Tenn.1990); *Tenn-Tex Properties v. Brownell–Electro, Inc.*, 778 S.W.2d 423, 425-26 (Tenn.1989). Accordingly, appellate courts routinely decline to second-guess a trial court's credibility determinations unless there is concrete, clear, and convincing evidence to the contrary. *See Bingham v. Dyersburg Fabrics Co., Inc.*, 567 S.W.2d 169, 170 (Tenn.1978); *Thompson v. Creswell Indus. Supply, Inc.*, 936 S.W.2d 955, 957 (Tenn.Ct.App.1996).

> The most often cited reason for this principle can be traced to the fact that trial judges, unlike appellate judges, have an opportunity to observe the manner and demeanor of the witnesses while they are testifying. *See Bowman v. Bowman*, 836 S.W.2d 563, 566 (Tenn.Ct.App. 1991). There are, however, other reasons for this principle. As the United States Supreme Court has observed:

>> The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise. Duplication of the trial judge's efforts in the court of appeals would very likely contribute only negligibly to the accuracy of fact determination at a huge cost in diversion of judicial resources. In addition, the parties to a case on appeal have already been forced to concentrate their energies and resources on persuading the trial judge that their account of the facts is the correct one; requiring them to persuade three more judges at the appellate level is requiring too much.

> *Anderson v. City of Bessemer City*, 470 U.S. 564, 574-75, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985).

*Mitchell v. Archibald*, 971 S.W.2d 25, 29 (Tenn.Ct.App.1998).

-11-

The first issue asserted by Husband is that the trial court erred in failing to deviate downward from the guidelines because he had custody of the parties' child for considerably more than the minimum time contemplated by the guidelines. Child Custody remains as ordered in the December 8, 1998, divorce decree because Husband's counter petition for a change in custody was severed from Wife's Petition relative to child support and remains pending before the trial court. Setting of child support and deviations from the guidelines are matters resting in the sound discretion of the trial court and will not be disturbed on appeal in the absence of an abuse of discretion. *State, ex rel. Vaughn v. Kaatrude*, 21 S.W.3d 244, 248 (Tenn.Ct.App. 2000); *Downing v. Downing* W2003-00561-COA-R3-CV, 2004 WL 1196100 \*\*3-4 (Tenn.Ct.App. May 27, 2004).

Husband next complains that the trial court erred in imputing earnings to him without making a prior finding of voluntary underemployment. Wife counters with the insistence that the trial court erred in not finding that William Smith was willfully and voluntarily unemployed or underemployed from July of 2000 through the June 2003 hearing date, and in not making the resulting portion of Husband's child support retroactive to the filing of the Petition on July 3, 2000.

The trial court imputed earnings of $45,000 a year to Husband from and after the date of the hearing, June 27, 2003. The trial court did not make a finding that Husband had been willfully and voluntarily unemployed or underemployed prior to that date. The only viable reason for Husband's lack of employment outside of being executor of his mother's estate involves his allegations of impaired health. According to the surgeon who ultimately performed Husband's belated surgery in August of 2002, this procedure would have alleviated any such condition by the beginning of 2003. The income imputed by the trial court was the same income Husband was earning as an assistant attorney general prior to his removal to Memphis to look after his father's estate and his ailing mother. The amount of imputed income is supported by the proof and is in the discretion of the trial judge. However, we determine from the preponderance of proof in the record that Husband was willfully and voluntarily underemployed from January 1, 2003. Child support based upon an imputed income of $45,000 per year should be assessed retroactively to January 1, 2003. *Garfinkle v. Garfinkle*, 945 S.W.2d 744, 744 (Tenn.Ct.App.1996); *see also Ralston v. Ralston*, 1999 WL 562719. \*3 (Tenn.Ct.App.).

Husband next argues that the trial court erred in imputing investment income of $38,200 per annum since no evidence existed in the record that he should be earning five percent (5%) per annum return on his assets. Wife counters that the trial court erred by failing to consider Husband's inheritance as income under the guidelines for the purpose of computing child support and giving retroactive effect to the date of filing as to this element of increased child support.

Wife relies on *Klemetsrud v. Klemetsrud*, 1994 WL 556365 (Tenn.Ct.App.) and *Ford v. Ford*, 1998 WL 730201(Tenn.Ct.App.) as authority for requiring a court to consider an entire inheritance as income for the purpose of the guidelines. While this option was available to the trial court, nothing mandates a trial court to so hold. *Ford v. Ford*, 1988 WL 730201, \* 4 (quoting from Tenn. Comp. R. and Regs. 1240-2-4-.03(3)(a), as stating that gross income includes "all income from any source . . . whether earned or unearned.") The trial court chose, however, to calculate child

support by using the net inheritance remaining as of June 30, 2003, ($764,322.00) as a basis for imputing future investment income and calculating child support accordingly. This discretionary decision is not contrary to governing law, and we will not substitute our judgment for that of the trial court merely because we might have chosen another alternative. *See State ex rel. Vaughn v. Kaatrude*, 21 S.W.3d at 248. Since the inheritance of Husband occurred in 1999, and he has had the benefit of that inheritance since prior to the time the Petition was filed on July 3, 2000, we find that the trial court erred in not making this element of the child support obligation retroactive to July 3, 2000.

The next issue involves Husband's assertion that he should not bear the cost of private school tuition for the minor child of the parties equally with Wife and Wife's assertion that Husband should have to pay more than fifty percent (50%) of such tuition and expense. The proof supports the view that Patrick Smith is a special needs child and that private school tuition is, thus, an extraordinary or additional expense within the meaning of the child support guidelines. *Barnett v. Barnett*, 27 S.W.3d 904, 907 (Tenn.2000). While the income of the non-custodial parent is irrelevant to the determination of ordinary percentage of income of the obligor spouse under the guidelines, a comparison of incomes is proper in determining which spouse will pay which part of private school tuition and expenses that qualify as "extraordinary" expenses under the guidelines. *Barnett*, 27 S.W.3d at 907. Under *Barnett*, the extraordinary expenses of private school tuition would ordinarily be added to the obligor's basic child support obligation, but if strict application of the guidelines resulted in an "unjust or inappropriate imbalance in the obligations of the respective parents, a downward deviation may be considered by the court. *Barnett*, 275 S.W.3d at 908. This question is discussed at length in *Earthman v. McCray*, 2003 WL 1860527 (Tenn.Ct.App.), and that case is quite instructive in determining this issue on appeal. In *Earthman*, the father had sole custody of three minor children and decided that the older child needed to be enrolled at the Webb School, a private boarding school. Tuition and expenses amounted to a net cost of $16,650 per year. Husband earned $140,000 a year, while Wife earned $49,000 a year. The trial court ordered Wife to pay $6,000 of the yearly private school expenses, which amounted to approximately thirty-five percent (35%) of the total cost. Direct comparison of the two incomes would have resulted in Wife paying only twenty-six percent (26%) of the total of her income or $4,300 per year. This Court affirmed the trial court allocation holding that requiring the mother to pay $6,000 as not an abuse of discretion.

While the trial court made no specific findings as to the comparative incomes of the parties, the record clearly shows that Wife is an accomplished businesswomen who has accumulated considerable wealth, and prior to Husband's inheritance, willingly carried practically the entire cost of supporting Patrick. The trial court made a determination that each party should bear fifty percent (50%) of the extraordinary expenses of a private school education for Patrick, and we cannot say, on this record, that the trial court abused its discretion in making such allocations. *Barnett v. Barnett*, 27 S.W.3d 904; *Earthman v. McCray*, 2003 WL 1860527 (Tenn.Ct.App.).

Next, Husband claims that the trial court erred in finding a breach of good faith by the appellant relating to paragraph 11 of the Marital Dissolution Agreement.

Paragraph 11 envisioned Husband's sale of his Lakeland real estate in Shelby County and after the sale, his movement of his residence to the Greenbrier property located in Williamson County. Two provisions of paragraph 11 control the issue.

> . . . Husband shall, as soon as practicable, place the Lakeland Real Estate on the market for sale. Upon the sale of such Lakeland Real Estate, after the payment of mortgage debt and the costs of sale, Husband shall pay Wife the sum of $45,000 in exchange for all of Wife's right, title and interest in and to the Greenbrier Road Real Estate, and Wife shall concurrently execute a quit claim deed conveying her interests to Husband. After the execution of such quit claim deed, Husband shall hold Wife harmless from all mortgage debt, costs and expenses in connection with the Greenbrier Road Real Estate, and he shall be entitled to receive all rent, income, and other payments, and income tax deductions attributable to such real estate. Husband shall, insofar as financially practicable, take steps to secure Wife's release from the mortgage debt on such Greenbrier Road Real Estate; however, the Parties agree and understand that this may not be financially practicable.

> In the event Husband is unable to secure Wife's release from all debt obligations secured by the Greenbrier Road Real Estate, Husband shall execute a deed of trust in favor of Wife concurrently with Wife's execution of a deed quit claiming her interest in the Greenbrier Road Real Estate to Husband. The Deed of Trust shall be in a form acceptable to counsel for Wife and shall secure all of Husband's obligations and the performance of all of Husband's duties under the existing Deed of Trust granted by the Parties to secure payment of the mortgage obligation currently in existence on the Greenbrier Road Real Estate. The Parties shall direct that a copy of any default notices or other communications regarding the first mortgage be mailed to Wife at an address designated by her. Further, notwithstanding the foregoing, if Husband has not secured Wife's release from all debt obligations secured by the Greenbrier Road Real Estate within five (5) years of the entry of a Final Decree of Divorce in this cause, the Greenbrier Road Real Estate shall immediately be placed upon the market and sold. After payment of all remaining debt and the cost of sale, Husband shall be entitled to retain the proceeds as his sole and separate property, free and clear of any claim by Wife.

Husband, apparently, has taken the position that the five-year provision relative to the Greenbrier Road Real Estate is effective to postpone for five years his duty to market the Lakeland Real Estate ". . . as soon as practicable, . . . ." He is mistaken.

His duty under the Marital Dissolution Agreement is to market "as soon as practicable" the Lakeland Real Estate and immediately pay the mortgage debt, the costs of sale, and pay to Wife the sum of $45,000 at which time she will quit claim all of her interest in the Greenbrier property to Husband.

The second paragraph above has only to do with the Greenbrier Real Estate, and then only to do with debt obligations secured by the Greenbrier Real Estate. It is the sale of the Lakeland Real Estate that triggers Husband's obligation to pay to Wife $45,000 and the decisive question is did Husband breach the Marital Dissolution Agreement by failing to market for sale the Lakeland Real Estate "as soon as practicable." The trial court held that he failed to make a good faith effort to market the Lakeland property in accordance with the Marital Dissolution Agreement, and the evidence in the record clearly supports this finding of the trial judge. Husband made practically no effort to market the Lakeland property. When he received his inheritance, he paid off the debts on both the Lakeland and Greenbrier properties, thus, reducing his liquid assets, but refused to pay Wife the $45,000 due under the Marital Dissolution Agreement, which in fact represented her down payment on the Greenbrier property. The trial court rendered a judgment for $54,000 in favor of Wife and against Husband, representing the $45,000 payment due under the Marital Dissolution Agreement plus interest at a rate of six percent (6%) per annum from March 1, 2000, through June 30, 2003. In this action, the trial judge was clearly correct, and we affirm this portion of the judgment.

Lastly, Husband complains about the trial court's award of attorney's fees to Wife. While Husband had an attorney of record in the trial court, he in fact represented himself both in the trial court and in this Court, and he asserts this issue to be:

VI. THE TRIAL COURT ERRED IN AWARDING ATTORNEYS FEES TO APPELLEE AND IN NOT AWARDING APPELLANT ATTORNEY FEES, PARTICULARLY, WHERE THE APPELLANT VOLUNTARILY INCREASED SUPPORT PRIOR TO THE PETITION, ACKNOWLEDGED THE CHILD'S SPECIAL NEEDS, AND WHERE APPELLEE AND HER COUNSEL FOR THREE YEARS PURSUED A BASELESS, BUT COSTLY, CLAIM OF VOLUNTARILY UNDEREMPLOYMENT, UP TO AND THROUGH TRIAL, DESPITE CONVINCING MEDICAL PROOF TO THE CONTRARY.

There were no post-divorce proceedings in this case from the time of the December 8, 1998, Divorce Decree until after Husband had received his inheritance from his mother's estate and until after he had failed in good faith to market the Lakeland property. Attorney's fees are justified in this case both under Tennessee Code Annotated 36-5-103(c) and under paragraph 21 of the Marital Dissolution Agreement. This extended litigation has been primarily the result of Husband's failure to fulfill his obligations under paragraph 11 of the Marital Dissolution Agreement and his failure to recognize that his inheritance triggered a substantial increase in his child support obligation and that Appellee was forced to resort to court to delineate the scope of such obligation. The judgment of the trial court as to attorney's fees will be affirmed.

Wife seeks attorney's fees in this appeal, and we hold that under both Tennessee Code Annotated 36-5-103(c) and paragraph 21 of the Marital Dissolution Agreement she is entitled to recover her reasonable attorney's fees on appeal. *See Parnham v. Parnham*, 2001 WL 120734 (Tenn.Ct.App.).

CONCLUSION

In this case, much of the record is consumed in medical testimony and medical argument concerning the physical condition of Husband. Much of the relevance of this evidence is foreclosed by the December 8, 1998, Divorce Decree wherein the appellant's income was set at $12,000 per year with a resulting $200 per month child support obligation which Wife did not enforce. The imputation of income because of underemployment is not assessed under this judgment until January 1, 2003, at which time, by the testimony of his surgeon, he was recovered. Every other issue in the case involves Husband's failure to act under the Marital Dissolution Agreement relative to disposition of the Lakeland property and the effects of his inheritance on his child support obligations. Except as modified herein, we affirm in all respects the judgment of the trial court, remand the case to the trial court for the award to Wife of attorney's fees on appeal in such reasonable amount as the trial court may determine. The trial court may, likewise, take any further action required not inconsistent with this judgment.

Costs of appeal are assessed against Appellant, William Ashby Smith, Jr.

_____
WILLIAM B. CAIN, JUDGE

-16-